## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW MEXICO

Dale Hiller, d/b/a YouTube Channel
Lackluster,

       Plaintiff,

vs.                                           No. 1:22-CV-00865

CIRCLED WAGONS MANAGEMENT, LLC,
a New Mexico Limited Liability Company, and
NICHOLAS LAYMAN,

       Defendants,

--------------------------------------------------------

CIRCLED WAGONS MANAGEMENT, LLC,

       Counter-Claimant/Third-party Plaintiff,

vs.

Dale Hiller d/b/a YouTube Channel Lackluster,

       Counter-Defendant,

and

LACKLUSTER MEDIA, LLC,

       Third-party Defendant.

## <u>ANSWER TO COMPLAINT, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT</u>

       Defendant/Counter-Claimant/Third-party Plaintiff Circled Wagons Management, LLC,

d/b/a YouTube channel "Cops&Cons" and formerly d/b/a "Cop Watch TV" ("Circled Wagons"),[1]

---

[1] Nicholas Layman has not yet been properly served in this matter; consequently, only Circled Wagons answers at this time.

by and through its counsel of record, Kennedy, Hernandez & Harrison, P.C. (Paul J. Kennedy, Jessica M. Hernandez, and Esther C. Jamison), hereby states the following as and for its Answer to the Complaint in the above-styled cause:

1.    Paragraph 1 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 1 state any basis for liability against the Defendants.

2.    To the extent that Paragraph 2 alleges that Plaintiff Dale Hiller's video, "Ex-Cop Knocks Out Postal Worker - His Old Department Let's Him Walk" [sic], https://www.youtube.com/watch?v=8p6EYZgFuwI ("Ex-Cop Video"), was posted on December 28, 2021, Circled Wagons admits this allegation. To the extent that Paragraph 2 states that the Ex-Cop Video is based on footage in the public domain, Circled Wagons denies this allegation. Circled Wagons affirmatively states that Hiller used Circled Wagons' video, "Retired Cop Thumps Postal Worker Doesn't Get Arrested," https://www.youtube.com/watch?v=_XsWy0pCYs ("Retired Cop Video"), to create the Ex-Cop Video, and that Circled Wagons' watermark, "Cop Watch TV"), is visible in the Ex-Cop Video. Furthermore, Circled Wagons affirmatively states that it created the Retired Cop Video by: (i) acquiring the raw body camera footage in question through an Inspection of Public Records Act ("IPRA") request made to the City of Las Vegas, New Mexico; (ii) editing the raw body camera footage from five separate videos into a watchable 38-minute narrative; (iii) enhancing visual and audio elements of the footage to make it easier to watch and to hear dialogue; (iv) creatively editing the footage by switching between different camera angles and audio tracks to tell the story of what happened in the most compelling and effective way; (v) editing out violent, sensitive, and controversial content so that the video would meet YouTube's advertiser-friendly guidelines to become a "monetized" video with advertisements;

(vi) adding chapter markers and descriptions so that viewers could navigate to key parts of the video easily; and (vii) adding its watermark logo, "Cop Watch TV," throughout the Retired Cop Video. Circled Wagons denies that it submitted a Digital Millennium Copyright Act ("DMCA") takedown notice for the Ex-Cop Video on January 6 and another notice on January 7, 2022. Circled Wagons affirmatively states that it submitted a DMCA takedown notice for the Ex-Cop video on January 3, 2022, and that it added to the existing takedown notice Hiller's shorter video based on the same Retired Cop Video entitled, "How would they treat you? #shorts" YOUTUBE, https://www.youtube.com/watch?v=J2A1DcVNqTY ("Short Video"), on January 6, 2022.  To the extent that Paragraph 2 describes other events involving Hiller's channel during December 2021 and January 2022, Circled Wagons lacks sufficient information to admit or deny those allegations, and therefore denies the same. All other allegations in this paragraph are denied.

3.      To the extent that Paragraph 3 alleges that Circled Wagons obtained the raw body camera footage from the City of Las Vegas and used that footage to create the Retired Cop Video, this allegation is admitted. Paragraph 3's assertion that raw body camera footage is in the public domain is a legal conclusion to which no response is required. To the extent that a response is required, Circled Wagons denies that this allegation states any basis for liability against the Defendants. The remaining allegations in Paragraph 3 are denied. Circled Wagons affirmatively states that it had a good faith belief that it owned copyright in the Retired Cop Video, because of its creative input in editing the raw body camera footage as described in Answer Paragraph 2, supra.

## PARTIES

4.      Circled Wagons is without sufficient information to admit or deny Paragraph 4, and therefore denies the same.

5.      To the extent that Paragraph 5 states that Nicholas "Laymen" is a member of Circled Wagons, it is denied. Circled Wagons affirmatively states that Nicholas Layman's last name is spelled "Layman" and not "Laymen," and that Nicholas Layman is a member of Circled Wagons. To the extent that Paragraph 5 alleges that Mark Aragon lives at 4431 Sherre Dr. NE, Albuquerque, New Mexico 87111, that Nicholas Layman lives at 7301 Rockwood Rd SW, Albuquerque, New Mexico 87121, and that Circled Wagons Management's principal place of business is at 4431 Sherre Dr. NE, those allegations are denied. Circled Wagons affirmatively states that its business address is 1330 San Pedro Dr. NE, Suite 111, Albuquerque, New Mexico 87110. The remaining allegations in Paragraph 5 are admitted.

## JURISDICTION AND VENUE

6.      Paragraph 6 states a legal conclusion to which no response is required. To the extent that a response is required, Circled Wagons denies that this allegation states any basis for liability against the Defendants.

7.      Circled Wagons admits the allegations in Paragraph 7.

8.      Circled Wagons admits the allegations in Paragraph 8.

9.      Circled Wagons admits the allegations in Paragraph 9.

10.     Circled Wagons admits the allegations in Paragraph 10.

## FACTUAL ALLEGATIONS

11.     To the extent that Hiller states that he creates "derivative work" as defined in the Copyright Act, this is a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that this allegation states any basis for liability against the Defendants. To the extent that Paragraph 11 states that Hiller's YouTube channel is monetized and currently has over 645,000 subscribers, it is admitted. Circled Wagons is without sufficient

information to admit or deny the remaining allegations in Paragraph 11, and therefore denies the same.

12.     To the extent that Paragraph 12 states that Circled Wagons' channel, now "Cops&Cons" (formerly "Cop Watch TV"), is monetized, it is admitted. Circled Wagons affirmatively states that it currently has around 379,000 subscribers, and that the information in its channel's "About" description now uses the channel's new name, "Cops&Cons." Insofar as Paragraph 12 reproduces the "About" information from Circled Wagons' channel, this information speaks for itself.

13.     To the extent that Paragraph 13 alleges that Circled Wagons issued a takedown notice for the Ex-Cop Video on January 6, 2022, Paragraph 13 is denied. Circled Wagons affirmatively states that it issued the takedown notice for the Ex-Cop Video on January 3, 2022. To the extent that Paragraph 13 states that Hiller first posted the Ex-Cop Video on December 28, 2021, this is admitted.

14.     To the extent that Paragraph 14 states that Circled Wagons posted the Retired Cop Video on December 16, 2021, it is admitted. To the extent that Paragraph 14 states that the body camera footage upon which the Retired Cop Video is based depicts law enforcement response to a retired Las Vegas police officer's assault on a federal postal worker, it is admitted. Circled Wagons denies the remaining allegations in this paragraph. Circled Wagons affirmatively states that it obtained the raw body camera footage through an IPRA request and incorporates its response to Paragraph 2 here.

15.     To the extent that Paragraph 15 states that Circled Wagons' Retired Cop Video was used in and pervades Hiller's Ex-Cop Video, Circled Wagons admits this allegation. To the extent that Paragraph 15 states that Hiller posted a link to the Retired Cop Video in his description of the

Ex-Cop Video when it was first posted, Circled Wagons is without sufficient information to admit or deny this allegation, and therefore denies the same. To the extent that Paragraph 15 states that the Ex-Cop Video currently has a link to the Retired Cop Video in its description, Circled Wagons admits this allegation. Circled Wagons denies the remaining allegations in Paragraph 15.

16.     Circled Wagons denies the allegations in Paragraph 16.

17.     To the extent that Paragraph 17 contends that the Defendants issued the takedown notice for the Ex-Cop Video on January 6, 2022, Circled Wagons denies this allegation. Circled Wagons affirmatively states that it issued the takedown notice for the Ex-Cop Video on January 3, 2022. Circled Wagons is without sufficient information to admit or deny the remaining allegations in Paragraph 17, and therefore denies the same.

18.     To the extent that Paragraph 18 alleges that Circled Wagons was notified by YouTube about Hiller's counternotification, Circled Wagons admits this allegation. Circled Wagons affirmatively states that it received notice of Hiller's counter notification for the Ex-Cop Video on January 7, 2022, and that Hiller's message stated:

> Is [sic] an egregious violation of section 107 of the copyright act (fair use) and public domain. Not only is the video we published transformative, the body camera portions used in the production are public domain and cannot be owned by any single member of the public or private organization. We demand the strike is removed immediately and that the video is returned to public status on YouTube or we will pursue civil action.

In response to the remaining allegations in Paragraph 18, Circled Wagons states that the content of Hiller's counternotification speaks for itself.

19.     To the extent that Paragraph 19 states that Circled Wagons issued a second takedown notice for the Short Video, it is denied. To the extent that Paragraph 19 states that the Defendants added the Short Video to their existing takedown notice for the Ex-Cop Video, because it was based on the same Retired Cop Video as the Ex-Cop Video, it is admitted. To the extent that

Paragraph 19 alleges that Hiller uploaded the Short Video on December 26, 2021, it is admitted. Circled Wagons denies the remaining allegations in this paragraph.

20.    To the extent that Paragraph 20 alleges that Circled Wagons issued the takedown notice for the Short Video on January 7, 2022, it is denied. Circled Wagons affirmatively states that it added the Short Video to its existing takedown notice for the Ex-Cop Video on January 6, 2022. Circled Wagons is without sufficient information to admit or deny the remaining allegations in Paragraph 20, and therefore denies the same.

21.    Circled Wagons denies the allegations in Paragraph 21. Circled Wagons affirmatively states that Mr. Layman called Hiller on January 10, 2022, in an attempt to resolve the situation. Circled Wagons affirmatively states that any statements Mr. Layman made during that telephone call were made in good faith as a gesture of good will and in an attempt to resolve the dispute: Mr. Layman made no admissions of legal liability.

22.    Circled Wagons admits Paragraph 22. Circled Wagons affirmatively states that Hiller requested that Circled Wagons retract the takedown notice during the January 10, 2022, telephone call, and that Circled Wagons, in a good faith effort to resolve the dispute, submitted the retraction to YouTube later that day. Circled Wagons affirmatively states that Mr. Layman asked Hiller during that conversation to remove two posts on Lackluster's "Community" tab that were causing Circled Wagons' channel to lose subscribers and that were inviting negative and disparaging comments about Circled Wagons' channel, in addition to "downvotes" or "dislikes" of the Retired Cop Video and other videos on Circled Wagons' channel. Circled Wagons affirmatively states that Hiller never did remove the two Community posts, even though Circled Wagons, in good faith, retracted the takedown notice.

23.     Circled Wagons is without sufficient information to admit or deny the allegations in Paragraph 23, and therefore denies the same.

24.     Circled Wagons is without sufficient information to admit or deny the allegations in Paragraph 24, and therefore denies the same.

## COUNT ONE: MISREPRESENTATION OF COPYRIGHT INFRINGEMENT UNDER DIGITAL MILLENIUM COPYRIGHT ACT (17 U.S.C. § 512(f))

25.     Circled Wagons responds to Paragraph 25 by incorporating its responses to the above paragraphs as though fully set forth herein.

26.     Paragraph 26 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in this paragraph state any basis for liability against the Defendants.

27.     Paragraph 27 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 27 state any basis for liability against the Defendants.

28.     Paragraph 28 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 28 state any basis for liability against the Defendants.

29.     Paragraph 29 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 29 state any basis for liability against the Defendants.

30.     Paragraph 30 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 30 state any basis for liability against the Defendants.

**Derivative Works**

31.     Paragraph 31 states legal conclusions to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 31 state any basis for liability against the Defendants.

32.     Paragraph 32 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 32 state any basis for liability against the Defendants.

33.     To the extent that Paragraph 33 alleges that the Plaintiff transforms police body camera footage with "commentary, analysis and other information," Circled Wagons lacks sufficient information to admit or deny this allegation, and therefore denies the same. To the extent that Paragraph 33 alleges that the Plaintiff "creates 'derivative work,'" Paragraph 33 states a legal conclusion to which no response is required. To the extent a response is required, Circled Wagons denies that this allegation in Paragraph 33 states any basis for liability against the Defendants.

34.     Circled Wagons denies the allegations in Paragraph 34.

35.     To the extent that Paragraph 35 suggests that all Circled Wagons did was add a watermark logo to raw body camera footage, this allegation is denied. To the extent that Paragraph 35 states that Circled Wagons merely created a copy of the raw body camera footage, this allegation is denied. The remaining allegations in Paragraph 35 state legal conclusions to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 35 state any basis for liability against the Defendants.

36.     To the extent that Paragraph 36 states that creative input -- such as the creativity Circled Wagons used in making the Retired Cop Video, see Answer ¶ 2, supra -- triggers copyright protection for body camera footage, this allegation is admitted. The remaining allegations in

Paragraph 36 state legal conclusions to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 36 state any basis for liability against the Defendants.

37.    To the extent that Paragraph 37 states that an original selection or arrangement of facts -- as reflected in Circled Wagons' Retired Cop Video -- triggers copyright protection, this allegation is admitted. The remaining allegations in Paragraph 37 state legal conclusions to which no response is required. To the extent a response is required, Circled Wagons denies that the allegations in Paragraph 37 state any basis for liability against the Defendants.

38.    Circled Wagons denies the allegations in Paragraph 38.

**Defendants' Liability Under 17 U.S.C. § 512(f)**

39.    Circled Wagons denies the allegations in Paragraph 39. Circled Wagons affirmatively states that it had a good faith basis for believing that it owned the copyright in the Retired Cop Video when it submitted the takedown notice for the Ex-Cop Video and added the Short Video to that same notice.

40.    To the extent that Paragraph 40 alleges that YouTube is an internet service provider which hosts both Circled Wagons' and Hiller's channels, this allegation is admitted. Circled Wagons denies the remaining allegations in Paragraph 40.

41.    Circled Wagons denies the allegations in Paragraph 41.

42.    Circled Wagons denies the allegations in Paragraph 42.

**AFFIRMATIVE DEFENSES**

Specifically denying liability herein, Circled Wagons raises the following separate and alternative affirmative defenses to the Complaint:

**First Affirmative Defense: Failure to State a Claim**

43.     The Plaintiff fails to state a claim upon which relief can be granted.

## Second Affirmative Defense: Unclean Hands

44.     The Plaintiff's claims should be dismissed on equitable grounds, because the Plaintiff has unclean hands and/or is guilty of bad faith; therefore, the Plaintiff cannot recover for or claim the relief sought in the Complaint.

## Third Affirmative Defense: Good Faith

45.     Circled Wagons had a good faith belief that it owned copyright in the Retired Cop Video.

46.     Circled Wagons had a good faith belief that Hiller's use of the Retired Cop Video was not authorized by law.

47.     Circled Wagons at all times material to this Complaint acted in good faith towards Hiller in seeking to resolve the dispute.

## Fourth Affirmative Defense: Failure to Mitigate Damages

48.     Assuming, *arguendo*, that Hiller suffered any actual damages as alleged in the Complaint, which Circled Wagons denies, Hiller failed to mitigate those damages by acquiring his own version of the raw body camera footage from the City of Las Vegas, editing it himself and posting it on his channel. If such little effort went into the creation of the Retired Cop Video as Hiller alleges, mitigating his damages in this way would have been the work of moments.

49.     Circled Wagons reserves the right to change or augment the defenses described herein as this litigation develops.

WHEREFORE, Circled Wagons prays that judgment be entered in the Defendants' favor and against the Plaintiff, including an award of attorneys' fees and costs under 17 U.S.C. § 512(f) or § 505, and that the Complaint be dismissed with prejudice.

## DEMAND FOR JURY TRIAL

Circled Wagons demands a trial by jury.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT FOR MATERIAL MISREPRESENTATION UNDER 17 U.S.C. § 512(f), DEFAMATION, UNFAIR PRACTICES ACT, PRIMA FACIE TORT, AND UNJUST ENRICHMENT

Defendant/Counter-Claimant/Third-party Plaintiff Circled Wagons Management, LLC, d/b/a "Cops & Cons" and formerly d/b/a "Cop Watch TV" ("Circled Wagons"), by and through its counsel of record, Kennedy, Hernandez & Harrison, P.C. (Paul J. Kennedy, Jessica M. Hernandez, and Esther C. Jamison), hereby states the following as and for its counterclaims against Dale Hiller, d/b/a "Lackluster," and Lackluster Media, LLC:

1.    Circled Wagons hereby incorporates its affirmative factual statements from Answer ¶¶ 1-24, supra, as though set forth fully herein.

## PARTIES

2.    Dale Hiller is doing business as YouTube channel, "Lackluster."

3.    Hiller formed Lackluster Media, LLC ("Lackluster Media"), on September 8, 2021, before this dispute arose.

4.    Upon information and belief, Hiller is the sole member and principal agent for Lackluster Media, and Lackluster Media acts through Hiller as its agent.

5.    Lackluster Media is registered and has its principal place of business in West Virginia.

6.    Circled Wagons adds Lackluster Media as a third-party defendant pursuant to Rule 20 of the Federal Rules of Civil Procedure, because Circled Wagons asserts its right to relief against Lackluster Media and Hiller with respect to the same series of transactions and occurrences, and questions of law and fact are common to both Hiller and Lackluster Media.

12

## FACTUAL BACKGROUND

7.      The Defendants submitted an Inspection of Public Records Act ("IPRA") request for body camera footage from the City of Las Vegas depicting "an incident involving [a] retired police officer . . . assault[ing] . . . a mail carrier." Request for Public Records from Cop Watch TV to the City Clerk for the City of Las Vegas, New Mexico, dated December 15, 2021.

8.      Circled Wagons obtained the raw body camera footage from the City of Las Vegas on December 15, 2021, in the form of links to digital video files.

9.      The original raw footage consisted of five separate body camera and lapel videos.

10.     The raw body camera footage captured City of Las Vegas police officers' response to an incident where a retired Las Vegas police officer assaulted a federal postal worker.

11.     Circled Wagons spent between five and eight hours editing the raw body camera footage into a watchable 38-minute narrative.

12.     Circled Wagons creatively edited the footage by switching between different camera angles and audio tracks to tell the story of what happened in the most compelling and effective way.

13.     Circled Wagons edited out violent, sensitive and controversial content so that the video would meet YouTube's advertiser-friendly guidelines and become a "monetized" video with advertisements.

14.     Circled Wagons enhanced visual and audio elements of the footage to make it entertaining to watch and easier to hear dialogue.

15.     Circled Wagons added chapter markers and descriptors to enable viewers to navigate through the video.

16.     To be appropriate for all types of advertisements, a YouTube video must meet YouTube's "Advertiser-friendly" guidelines, which state that "[v]iolence" -- among other topics -- is "not advertiser-friendly." See YouTube Help, Advertiser-friendly content guidelines, https://support.google.com/youtube/answer/6162278 (last visited Dec. 19, 2022).

17.     "Content where the focal point is on blood, violence, or injury, when presented without other context, is not suitable for advertising. If you're showing violent content in a news, educational, artistic, or documentary context, that additional context is important." YouTube Help, Advertiser-friendly content guidelines.

18.     To be "advertiser-friendly" content, videos must not contain: "Inappropriate language; Violence; Adult content; Shocking content; Harmful or dangerous acts; Hateful & derogatory content; Recreational drugs and drug-related content; Firearms-related content; Controversial issues; Sensitive events; Enabling dishonest behavior; Inappropriate content for kids and families; Incendiary and demeaning; Tobacco-related content." YouTube Help, Advertiser-friendly content guidelines.

19.     By "Violence," YouTube means:

Content where the focal point is on blood, violence, or injury, when presented without other context, is not suitable for advertising. If you're showing violent content in a news, educational, artistic, or documentary context, that additional context is important. For example, if a video provides authoritative news reporting on a violent event in a journalistic context, it may be eligible for monetization.

YouTube Help, Advertiser-friendly content guidelines.

20.     Circled Wagons edited out secondary footage from a neighbor's cell phone camera that depicted the actual assault, so that the video would not be demonetized for depicting violence.

21.     Circled Wagons edited out personal identifiers of suspects and victims, as well as threats against former President Trump that might trigger demonetization for sensitive or controversial content.

22.     Circled Wagons added their watermark logo to the footage, which was "Cop Watch TV" at the time of the Retired Cop Video's creation.

23.     Upon information and belief, Hiller did not request or obtain his own copy of the raw body camera footage from the City of Las Vegas.

24.     Circled Wagons first became aware of Hiller's Ex-Cop Video on or shortly before January 3, 2022, when YouTube's Copyright Match Tool alerted them that 98 percent of Hiller's Ex-Cop Video matched their Retired Cop Video.

25.     The Defendants considered the following facts before issuing the takedown notice:

   a.     Ninety-eight percent of the Ex-Cop Video matched the Retired Cop Video, according to YouTube's Copyright Match Tool.

   b.     Lackluster is a commercial, monetized channel, and the Ex-Cop Video and Short Video are monetized videos, from which Hiller gains substantial advertising revenue.

   c.     Hiller's Lackluster channel is a market competitor to Circled Wagons' channel, and views of the Ex-Cop Video and Short Video negatively affected the number of views the Retired Cop Video received, thus decreasing substantially the amount of advertising revenue that Circled Wagons received from the Retired Cop Video.

   d.     Hiller could easily have obtained his own copy of the raw body camera footage from the City of Las Vegas and created own his video from this raw footage, but, instead, chose to take Circled Wagons' creative content without permission for his own economic gain.

26.     Circled Wagons submitted a DMCA takedown notice to YouTube for the Ex-Cop video on January 3, 2022.

27.     A few days later, YouTube's Copyright Match Tool notified Circled Wagons that one hundred percent of Hiller's Short Video matched the Retired Cop Video.

28.     Upon information and belief, the YouTube Copyright Match Tool did not detect the Short Video as quickly as it detected the Ex-Cop Video, because Hiller reformatted the Short Video to evade copyright detection by reducing it in size and nesting it within a larger video frame.

29.     Circled Wagons added the Short Video to the existing takedown notice for the Ex-Cop Video on January 6, 2022, because it was based on the same source video.

30.     Before adding the Short Video to the existing takedown notice, Circled Wagons considered the facts stated in Counterclaims Paragraph 26, supra, in addition to the fact that one hundred percent of the Short Video matched the Retired Cop Video, according to YouTube's Copyright Match Tool.

31.     After Hiller posted the Ex-Cop Video and Short Video, views of Circled Wagons' Retired Cop Video substantially declined.

32.     The Retired Cop Video had been on target to go viral, but after Hiller posted the Ex-Cop Video and Short Video, views of the Retired Cop Video started slowing down.

33.     Because the Retired Cop Video received fewer views, it garnered less advertising revenue.

34.     Hiller's Ex-Cop Video and Short Video display the "Cop Watch TV" watermark logo throughout.

35.     Circled Wagons received notice of the Plaintiff's counternotification from YouTube, which included a message from Hiller: "We demand the strike is removed immediately and that the video is returned to public status on YouTube or we will pursue civil action."

36.     Hiller posted the first of two posts tagging and targeting Circled Wagons' Channel on Lackluster's "Community" tab, on or around January 7, 2022. See generally, Lackluster Media, YOUTUBE, https://www.youtube.com/@LackLusterMedia/community (last visited Dec. 19, 2022).

37.     Hiller's first post stated: "The guys over at @CopWatchTV don't have a great understanding of public domain or Section 107 of the copyright act. They probably don't know we just settled with Nexstar/NBC for an identical situation." Lackluster Media, YOUTUBE, https://www.youtube.com/@LackLusterMedia/community (last visited Dec. 19, 2022) ("First Community Post").

38.     Hiller's First Community Post contained the factual assertion that Hiller's dispute with Circled Wagons is "identical" to Hiller's dispute with Nexstar/NBC.

39.     This statement was false, because the situation in this case is not identical to the Nexstar/NBC dispute.

40.     KARK TV is a subsidiary of Nexstar Media Group and an affiliate of National Broadcasting Company ("NBC"). See Nexstar Media Group, Inc., KARK, https://www.nexstar.tv/stations/kark/ (last visited Dec. 8, 2022) ("Nexstar Broadcasting Group purchased KARK, an NBC affiliate, from Morris Multimedia on August 1, 2003.").

41.     Upon information and belief, Hiller's dispute with KARK TV/Nexstar/NBC stemmed from Hiller's June, 2021, posting of his video, "Cop Flips Pregnant Woman's Car For Not Stopping Fast Enough," which Hiller edited from Arkansas State Police dashboard camera footage. See Lackluster Media, Cop Flips Pregnant Woman's Car For Not Stopping Fast Enough YOUTUBE (Jun. 8, 2021), https://www.youtube.com/watch?v=r3SEFddAKlY ("Cop Flips Car Video").

42.     Upon information and belief, Hiller posted the dashboard camera footage in the Cop Flips Car Video before KARK TV posted its version of the footage.

43.     Hiller's attorney, John Bryan, publicized the facts of Hiller's dispute with KARK TV on Bryan's own YouTube Channel in July, 2021. See The Civil Rights Lawyer, "Lackluster" Gets a Fraudulent Copyright Strike for Dashcam Footage and Now We Sue, YOUTUBE (Jul. 21, 2021), https://www.youtube.com/watch?v=rPqtT88PT9Y ("Bryan Video").

44.     The description of the Bryan Video states:

One of my favorite YouTube channels, @LackLusterMedia received a fraudulent DMCA takedown notice from KARK TV station in Little Rock, Arkansas for a viral video he posted about a pregnant woman who had her car flipped by a "PIT" maneuver by the Arkansas State Police. He had obtained the dashcam footage directly from the ASP. However, KARK had their own coverage and YT video using the footage, and claimed ownership of Lack's video. . . . Now I'm representing him and plan to make them pay. . . . I'll explain in the video.

45.     Bryan reiterates this in the video itself: "[Lackluster] didn't copy the video from [KARK] TV station, he didn't get it from them in any way. He got the video directly from the Arkansas State Police, so these were public records. . . . So he got that footage independent from KARK TV . . . . [I]f you watch Lackluster's video it doesn't have any kind of content from KARK, any other graphics . . . none of that." Bryan Video at 6:47-7:20.

46.     Upon information and belief, the Nexstar/NBC settlement Hiller references in his First Community Post is the same matter -- the dispute with KARK TV -- that Hiller's attorney John Bryan publicly describes in the Bryan Video.

47.     It is also the same matter that Bryan discusses at the beginning of a live interview with Hiller on December 1, 2021. See The Civil Rights Lawyer, Analysis of Recent Police Videos with Guest LACKLUSTER, YOUTUBE (Dec. 1, 2021), https://www.youtube.com /watch?v=8p29GeImE-c ("Bryan-Hiller Interview").

48.     In the Bryan-Hiller Interview on December 1, 2021, Bryan informed his audience -- in front of Hiller -- that the parties had settled that case: "So, you may have seen where I represented Lackluster in a copyright case dealing with a member of the legacy media[2] having to do with a video of his that was pulled due to a copyright strike. . .  [We] pursued that case, and all I can say is this, is that a settlement was reached in the case." Bryan-Hiller Interview at 3:27-3:52.

49.     According to a partially redacted demand letter displayed during the Bryan Video, which Bryan sent to KARK TV's "parent company," Bryan Video at 9:30, the footage at issue in Hiller's dispute with KARK TV "was obtained directly from the Arkansas State Police. While KARK also apparently obtained the footage and reported on the footage, my client's video was clearly not obtained from that coverage. It featured no KARK graphics, audio, alterations, or other editing," Bryan Video at 9:31.

50.     Unlike Hiller's dispute with KARK TV, here, Hiller did not obtain the body camera footage that he used in the Ex-Cop Video and Short Video directly from the city or police department. Rather, Hiller obtained his footage from Circled Wagons' Retired Cop Video.

51.     Unlike the footage at issue in the KARK TV dispute, which "featured no KARK graphics, audio, alterations, or other editing," it is undisputed that Hiller's Ex-Cop Video and Short Video bear the "Cop Watch TV" watermark logo.

52.     Unlike the dispute with KARK TV, where Hiller was the first to post his video, here, Circled Wagons posted the Retired Cop Video before Hiller posted the Ex-Cop Video and Short Video.

---

[2]Upon information and belief, Bryan and Hiller use the term "legacy media" in this interview to describe "[m]edia that is considered 'old,' such as radio, television, and . . . newspapers." Netlingo, LegacyMedia, https://www.netlingo.com/word/legacy-media.php  (last visited Dec. 6, 2022).

53.     Unlike the footage Hiller used that was at issue in the KARK TV dispute -- which "featured no KARK . . . editing" -- Circled Wagons spent between five and eight hours editing the raw body camera footage it received from the IPRA request to make the 38-minute Retired Cop Video.

54.     As a content creator himself, Hiller knew that the raw body camera footage requires editing in order to be monetized. In the Bryan-Hiller Video, he and Bryan discuss the stringency of YouTube's requirements for monetized video content:

> Hiller: I know a lot of these videos we're going to be watching, too, are ones that we normally wouldn't cover, because they're graphic in nature.

> Bryan: Right, so, that's one of the things that drives me crazy about YouTube is, everyone wants to see . . . police use of force videos, excessive use of force, because they're egregious, they tend to go viral, because people want to see them, they're interesting videos in bad ways, but, as somebody who has a YouTube channel, you get punished for putting them on, because they pretty much instantly demonetize any video that shows any -- doesn't even have to show violence -- it could just have some word that indicates there could be could be violence included on the video and they just instantly demonetize . At least they do mine.

> Hiller: Likewise. . . .

55.     Before Hiller's First Community Post, Hiller's channel and Bryan's channel had many subscribers in common.

56.     At least one commentator on Hiller's First Community Post made the connection between the Nexstar/NBC case and the KARK TV dispute, posting the following comment to Hiller's first Community post: "Is the Nex[s]tar thing from the Arkansas State Police PIT video?" Comments on First Community Post, YOUTUBE, https://www.youtube.com/post/UgkxeYxzJsWLpeO6S7KPLq-ukkYlUBqvwgZW (last visited Dec. 19, 2022).

57.   Unsurprisingly, Hiller's First Community Post spawned 254 comments, including predominantly negative and derogatory comments such as:

a.     "Sue them to the point they have to get Christmas gifts for their kids from the Fire Department."

b.     "Get 'em."

c.     "Imagine having a channel about knowing your rights and the law and still not understand[ing] the law lol."

d.     "They don't even own the footage in the first place. What idiots. Good luck with the lawsuit, teach them a lesson they won't forget!"

e.     "Unbelievable another channel on YouTube has copyrighted you for a body cam video anyone of us can have. . . . They must be thick as 2 short blanks over at that cop watch channel."

Comments on First Community Post.

58.   The First Community Post implicitly encouraged Hiller's subscribers -- several of whom were also subscribers of Cop Watch TV -- to stop viewing or subscribing to Circled Wagons' channel, as illustrated by comments such as:

a.     "I run a police accountability group on Facebook. Copwatch will no longer be on the timeline. They can consider themselves boycotted . . . ."

b.     "That's why I sub[scribe] to you and not them. This channel does it[]s research, they clearly do not and cannot be trusted . . . . I will not be associated with such low moral character."

c.     "They know what theyre doing. . .  Eliminating the competition ..slimy" [sic]

d.     "I unsubbed from c.w. this is b.s."

e.     "Unsubbed from them."

f.     "I un subscribed from cop watch over this."

g.     "This is not cool. Might have to unsub from their channel."

h.     "Already unsubscribed."

21

Comments on First Community Post.

59.     Lackluster followed up with a second Community post: "YouTube accepted our counter-notification. However, [Cop Watch TV] doubled down and striked another video on the channel. We had previously emailed them requesting the strike be removed in lieu of civil action, but now we're definitely going to court." Lackluster Media, YOUTUBE , https://www.youtube.com/@LackLusterMedia/community (last visited Dec. 19, 2022) ("Second Community Post").

60.     Hiller's Second Community Post elicited another 502 comments with similarly negative comments about Cop Watch TV, with many comments stating that the commentors would in the near future unsubscribe -- or had already unsubscribed -- from Circled Wagons' channel:

      a.     "I didn't realize this was going on. Just unsubscribed from them. . ."

      b.     "As someone who is subbed to cop watch . . . I can honestly say I will be unsubscribing from copy watch."

      c.     "it's obviously more about the money than the cause with that channel. will never click on one of their videos."

      d.     "Everyone who is subbed to copwatch unsub those clowns."

      e.     "I just Unsubb3d from them." [sic].

      f.     "Well that channel lost a sub."

      g.     "Everyone unsub cop watch."

      h.     "I unsubscribed from cop watch to support you brother. It's all I knew to do…"

Comments on Second Community Post, YOUTUBE, https://www.youtube.com/post/UgkxsJQLJNHrEQ7t7eV_oBZYdsZ44P2UtxLL (last visited Dec. 19, 2022).

61.     Several of Hiller's subscribers posted negative and derogatory comments on Circled Wagons' channel, or said they would report Cop Watch TV, as attested by comments on Hiller's second Community post such as:

a.    "I went and ripped him a new one in the comments."

b.    "I reported there [sic] channel and videos for practically everything."

Comments on Second Community Post.

62.    As a result of Hiller's posts, Circled Wagons spent hours deleting negative comments from its channel.

63.    Hiller replied to a comment on his Second Community Post to repeat his false factual assertion from the First Community Post: a commentor asked, "Court over youtube claims? I doubt it," to which Lackluster responded, "Just settled with Nexstar/NBC for literally the exact same thing." Comments on Second Community Post.

64.    Circled Wagons' Channel lost many subscribers after Hiller's Community posts.

65.    The Retired Cop Video was "downvoted" by many of Lackluster's followers, who also "downvoted" numerous other videos on their channel, leading to Circled Wagons' channel losing even more subscribers and views.

66.    To date, Hiller's Ex-Cop Video has around 202,000 views, his Short Video has around 421,000 views, while the Retired Cop Video -- the source material for both -- has netted only 167,571 views.

67.    The Ex-Cop Video and Short Video drew away significant amounts of advertising revenue from Circled Wagons.

68.    Hiller emailed Circled Wagons on January 6, 2022: "We have just appealed your false copyright strike. The video used is public domain AND transformative. We demand the video is re-instated and the strike is removed in lieu of civil action." Email from Dale Hiller to Circled Wagons, dated January 6, 2022, at 9:22:35 AM MST (January 6 Email).

69.    Circled Wagons responded to Hiller's January 6 Email on January 10, 2022, asking to talk to him to resolve the dispute.

70.    Circled Wagons reached out to Hiller to offer to "talk . . . on the phone and come to a resolution." Email from Circled Wagons to Dale Hiller, dated January 10, 2022 at 9:14 AM MST.

71.    Despite Hiller's false and harmful Community posts, Circled Wagons agreed to issue retraction notices to YouTube in a good faith effort to resolve the dispute, as Hiller had requested in his email and in the counternotification.

72.    In return, Circled Wagons asked Hiller to remove the Community posts that were doing so much harm to its channel. Hiller knew that his posts were damaging Circled Wagons' channel, but he refused to remove them.

73.    The decline in subscriptions resulting from Hiller's community posts significantly diminished Circled Wagons' revenue: in 2021, Circled Wagons' Channel's revenue had grown by around 180%; by contrast, in 2022, instead of growing as it was on track to do, fell by 39%. This was as a direct result of Hiller's actions.

74.    To avoid losing more subscribers, views and revenue due to Hiller's unjustified attacks, Circled Wagons renamed and rebranded their channel from "Cop Watch TV" to "Cops & Cons."

75.    Circled Wagons spent significant amounts of time and money rebranding its channel.

76.    Despite knowing that his posts were damaging Circled Wagons' channel, Hiller edited his Community posts to update and re-tag Circled Wagons' channel with its new name on

both Community posts, thus ensuring that Circled Wagons' channel would continue to be harmed by the posts.

77.     The loss of subscribers and loss of views to Circled Wagons' channel caused by both the posting of Hiller's videos and by his Community posts has devasted Circled Wagons' advertising revenue.

78.     Hiller's Community posts are still live and continue to damage Circled Wagons.

79.     YouTube's reinstatement of the Ex-Cop Video and Short Video also damaged the views and advertising revenue of the Retired Cop Video.

## COUNT I: MATERIAL MISREPRESENTATION UNDER 17 U.S.C. § 512(f)

80.     Circled Wagons fully incorporates by reference Paragraphs 1-79, supra, as though set forth fully herein.

81.     In addition to relief for alleged copyright infringers, Section 512(f) provides relief for a copyright holder who is harmed by an internet service provider's ("ISP") reinstatement of infringing content, due to the *infringer's* misrepresentations:

> Any person who knowingly materially misrepresents . . . that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by . . . any copyright owner . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation . . . in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

82.     YouTube is the ISP for Circled Wagons' and the Counter-Defendant's/Third-party Defendant's channels.

83.     As a content creator himself, Hiller knew, or should have known, that raw body camera footage of a police officer responding to a violent incident would likely need to be edited before being published on a monetized channel.

84.     Hiller knew that he obtained footage from Circled Wagons' channel and not directly from the City of Las Vegas.

85.     Had Hiller obtained his own copy of the footage, he would have learned that the footage was based on five separate videos that had been edited creatively into the Retired Cop Video.

86.     Hiller knew that the Retired Cop Video bore the Cop Watch TV watermark logo.

87.     Upon information and belief, Hiller knowingly materially misrepresented to YouTube that the Retired Cop Video was raw body camera footage in the public domain.

88.     Hiller knowingly materially misrepresented that YouTube removed the Ex-Cop Video and Short Video by mistake.

89.     YouTube's reinstatement of the Ex-Cop Video and Short Video injured Circled Wagons, because those videos drew -- and continue to draw -- viewers away from Circled Wagons' channel to Hiller's channel.

90.     Because views equal revenue on a monetized channel, the loss of views for the Retired Cop Video due to the posting and reinstatement of the Ex-Cop Video and the Short Video caused Circled Wagons tangible economic injury.

91.     Because of Hiller's material misrepresentations and the resulting injury to Circled Wagons, Circled Wagons seeks to recover damages in an amount to be proven at trial.

WHEREFORE, Circled Wagons seeks damages against Dale Hiller and Lackluster Media, LLC, and attorneys' fees and costs under 17 U.S.C. § 512(f); Circled Wagons seeks attorneys' fees and costs alternatively under 17 U.S.C. § 505.

## COUNT II: DEFAMATION

92.     Circled Wagons fully incorporates by reference Paragraphs 1-91, supra, as though set forth fully herein.

93.     This Court has supplemental jurisdiction over Circled Wagons' state law defamation counterclaim pursuant to 28 U.S.C. § 1367.

94.     Under New Mexico law, a prima facie case for defamation requires: "a defamatory communication, published by the defendant, to a third person, of an asserted fact, of and concerning the plaintiff, and proximately causing actual injury to the plaintiff." Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 16, 108 N.M. 424, 429, 773 P.2d 1231, 1236. See also N.M. Rules Ann., Civ. UJI 13-1002(B).  "Defamatory communications are those which tend to expose a person to contempt, to harm the person's reputation, or to discourage others from associating or dealing with" him or her. N.M. Rules Ann., Civ. Rule 13-1007. See Colbert v. J. Pub. Co., 1914-NMSC-042, ¶ 18, 19 N.M. 156, 142 P. 146, 149 ("Any false and malicious writing published of another is libelous per se, when its tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him."); Ormrod v. Hubbard Broad., Inc., No. CIV 17-0706 JB/KK, 2018 WL 1444857, at *10 (D.N.M. Mar. 22, 2018).

95.     Furthermore, "[i]n determining whether the communication was defamatory," juries "may consider whether there are other facts in evidence known to the person to whom the communication was published which, when taken into consideration with the communication, gave it a defamatory meaning." N.M. Rules Ann., Civ. Rule 13-1007. This paragraph "reflects the fact that sometimes publications 'are not on their face defamatory, but . . . may become so when considered in connection with innuendos and explanatory circumstances.'" NMRA, Rule 13-1007

Cmt.(quoting <u>Marchiondo v. New Mexico State Tribune Co.</u>, 98 N.M. 282, 288, 648 P.2d 321, 327 (Ct. App. 1981)).

96.     Hiller's First Community Post is defamatory, because it is not just a statement of opinion, but makes a factual assertion: "The guys over at @CopWatchTV don't have a great understanding of public domain or Section 107 of the copyright act. They probably don't know we just settled with Nexstar/NBC for an identical situation."

97.     Hiller's factual assertion in his First Community Post that his dispute with Circled Wagons is an "identical situation" to his dispute with Nexstar/NBC, is false.

98.     Hiller's First Community Post was intended to injure Circled Wagons' channel.

99.     Hiller's Second Community Post is also defamatory, because it is connected to and builds upon the false factual assertion in Hiller's First Community Post (which was already made known to Hiller's subscribers), and because Hiller repeats this same false statement in the comments section of the Second Community Post.

100.    Hiller's Community posts were published to his then approximately 350,000 subscribers.

101.    The First Amendment is not implicated here, because a "false statement of fact" is "'not worthy of constitutional protection.'" <u>Kutz v. Indep. Pub. Co.</u>, 1981-NMCA-147, ¶ 6, 97 N.M. 243, 244, 638 P.2d 1088, 1089 (quoting <u>Gertz v. Welch, Inc.</u>, 418 U.S. 323, 339-40 (1974)).

102.    Circled Wagons is private defamation plaintiff and not a public figure.

103.    Hiller's Community posts were not privileged.

104.    "The ordinary common law negligence standard of proof shall apply to private defamation plaintiffs to establish liability," but "[a] private defamation plaintiff who seeks punitive damages must prove actual malice." <u>Marchiondo v. Brown</u>, 1982-NMSC-076, ¶ 47, 98

N.M. 394, 402, 649 P.2d 462, 470. See Smith v. Durden, 2012-NMSC-010, ¶ 14, 276 P.3d 943, 946 ("[T]he States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.").

105.    Hiller knew that the Retired Cop Video was not raw body camera footage, because it had a watermark logo, and he knew that he took it directly from Circled Wagons' channel, instead of acquiring his own copy of the body camera footage as he did in the KARK TV dispute.

106.    Because Hiller posted the First Community Post and commented on the Second Community Post with knowledge of the statement's falsity or in reckless disregard for its truth, intending to injure Circled Wagons' channel, Hiller acted with actual malice, and is liable for punitive damages. See Marchiondo v. Brown, 1982-NMSC-076, ¶ 45, 98 N.M. 394, 402, 649 P.2d 462, 470 ("'States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.'" (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974)).

107.    The posts caused Lackluster's subscribers -- many of whom were also subscribers of Circled Wagons' channel -- to refrain from associating or dealing with the Counterclaimant by unsubscribing from Cop Watch TV/Cops&Cons.

108.    Hiller's Community posts caused Circled Wagons actual damages, as well as significant harm to Circled Wagons' channel's reputation.

109.    Hiller and Lackluster Media are liable for defamation and, because they acted with actual malice, are liable for punitive damages.

110.    Circled Wagons was injured by Hiller's defamatory statements in an amount to be proven at trial.

WHEREFORE, Circled Wagons requests compensatory and punitive damages against Dale Hiller and Lackluster Media, LLC, and other such relief as permitted by law.

## COUNT III: UNFAIR PRACTICES ACT

111.    Circled Wagons fully incorporates by reference Paragraphs 1-110, supra, as though stated fully herein.

112.    This Court has supplemental jurisdiction over Circled Wagons' Unfair Practices Act counterclaim pursuant to 28 U.S.C. § 1367.

113.    New Mexico has the greater interest in the resolution of this case, because New Mexico residents are injured by Hiller's actions; therefore, the New Mexico Unfair Practices Act applies.[3]

114.    The New Mexico Unfair Practices Act makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M.S.A. § 57-12-3. An "'unfair or deceptive trade practice' means . . . a false or misleading oral or written statement . . . of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . that may, tends to or does deceive or mislead any person," including "disparaging the goods, services or business of another by false or misleading representations." N.M.S.A. § 57-12-2(D).

115.    "Where the trier of fact finds that the party charged with an unfair or deceptive trade practice or an unconscionable trade practice has willfully engaged in the trade practice, the

---

[3]West Virginia has a parallel Consumer Credit and Protection Act -- see WV ST §§ 46A-6-102 through -110. "Unfair methods of competition and unfair or deceptive acts or practices" means and includes: . . . (H) Disparaging the goods, services or business of another by false or misleading representation of fact." W. Va. Code Ann. § 46A-6-102 (West).

court may award up to three times actual damages . . . to the party complaining of the practice." N.M. Stat. Ann. § 57-12-10 (West).

116.    Hiller alleges that the Lackluster channel has paid memberships and sells merchandise. See Complaint ¶ 23.

117.    Circled Wagons also offers merchandise for sale on its channel.

118.    Both Cop Watch TV/Cops&Cons and Lackluster channels are monetized, commercial channels.

119.    Hiller's statements on his Community tab disparaged the quality of Circled Wagons' services and business, because they misrepresent that Circled Wagons merely posts copies of raw body camera footage.

120.    These Community posts were made in connection with the sale of Hiller's goods and services, and in connection with Circled Wagons' provision of media services on Cop Watch TV/Cops&Cons.

121.    Hiller's disparaging posts about Circled Wagons' channel on Lackluster's Community tab were false and misleading.

122.    Because these disparaging comments were intentional and misleading, Hiller and Lackluster Media are liable for damages and punitive damages under the Unfair Practices Act.

WHEREFORE, Circled Wagons requests compensatory and punitive damages under the Unfair Practices Act against Dale Hiller and Lackluster Media, LLC, as well as attorneys' fees.

## COUNT IV: PRIMA FACIE TORT

123.    Circled Wagons fully incorporates by reference Paragraphs 1-122, supra, as though set forth fully herein.

124.    This Court has supplemental jurisdiction over Circled Wagons' prima facie tort counterclaim pursuant to 28 U.S.C. § 1367.

125.    Circled Wagons pleads prima facie tort in the alternative, should the Court conclude that Hiller's Community posts are lawful.

126.    New Mexico recognizes a cause of action for prima facie tort. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 35, 109 N.M. 386, 394, 785 P.2d 726, 734. The elements of prima facie tort are: "'(1) an intentional, lawful act, (2) committed with the intent to injure the plaintiff, (3) causing injury to the plaintiff, and (4) the absence of justification for the injurious act.'" Vigil v. Pub. Serv. Co. of New Mexico, 2004-NMCA-085, ¶ 10, 136 N.M. 70, 72, 94 P.3d 813, 815 (quoting Padwa v. Hadley, 1999-NMCA-067, ¶ 24, 127 N.M. 416, 981 P.2d 1234).

127.    Hiller's posts in the Lackluster Community tab were intended to injure Circled Wagons and its channel and did injure Circled Wagons and its channel.

128.    That the posts would have carried the economic benefit of garnering more views for Hiller's channel and reducing the number of his competitor's subscribers and views does not detract from their injurious purpose. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 47, 109 N.M. at 395, 785 P.2d at 735 (Although "the act must be committed with the intent to injure plaintiff, or, in other words, without justification, . . . it need not be shown that the act was solely intended to injure plaintiff").

129.    To decide whether an action is justified, "a court balances (1) the nature and seriousness of the harm to the plaintiff, (2) the interests promoted by the defendant's conduct, (3)

the character of the means used by defendant, and (4) the defendant's motives." Padwa v. Hadley, 1999-NMCA-067, ¶ 25, 127 N.M. 416, 424, 981 P.2d 1234, 1242. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 40, 109 N.M. at 394-95, 785 P.2d at 734-75.

130.    The posts were unjustified, because the nature and seriousness of the harm to Circled Wagons and the dubious nature of Hiller's means and motives outweigh any interests that Hiller and Lackluster Media may have had in posting those comments. Circled Wagons and its channel suffered harm to its reputation, harm to the number of subscribers to its channel, harm to its approval rating, and harm to its advertising revenue.

131.    On the other hand, Hiller used the means of a falsehood to mislead his subscribers into thinking that his dispute with Circled Wagons was the same as his successful dispute with KARK TV, where he obtained his own footage. This means served to distract his subscribers' attention from the fact that Hiller had taken the footage from Circled Wagons' channel, and not obtained his own.

132.    Upon information and belief, and by inference from the surrounding circumstances, Hiller's motives in posting the comments on his channel were to damage his competitor's reputation in the YouTube community while inflating his own.

133.    Upon information and belief, Hiller sought to punish Circled Wagons extra-judicially for the good-faith exercise of its legal right to protect its own creative content by encouraging any shared subscribers to unsubscribe from Cop Watch TV/Cops&Cons.

134.    Hiller's actions were also unjustified, because, despite the reputational and financial harm Hiller caused Circled Wagons, Circled Wagons nonetheless attempted in good faith to resolve the issue by retracting the takedown notification.

135.     Hiller's actions were made in reckless, willful, and wanton disregard of Circled Wagons' rights.

136.     Circled Wagons was injured by Dale Hiller and Lackluster Media, LLC's tortious conduct in an amount to be determined at trial.

WHEREFORE, Circled Wagons requests compensatory and punitive damages, costs, and any other such relief as permissible by law against Dale Hiller and Lackluster Media, LLC.

## COUNT V: UNJUST ENRICHMENT

137.     Circled Wagons fully incorporates by reference Paragraphs 1-136, supra, as though stated fully herein.

138.     This Court has supplemental jurisdiction over Circled Wagons' unjust enrichment counterclaim pursuant to 28 U.S.C. § 1367.

139.     "To prevail on a claim for unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 260 P.3d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695).

140.     Hiller and Lackluster Media have been unjustly enriched by using Circled Wagons' creative product without authorization, and by damaging Circled Wagons' channel's reputation for their own financial gain.

141.     Hiller and Lackluster Media knew that they were benefitting financially from their unauthorized use of Circled Wagons' creative product.

142.     The manner in which Hiller and Lackluster Media acquired Circled Wagons' creative product without authorization was unjust.

34

143.     Hiller and Lackluster Media misled the public into believing that they had settled with Nexstar/NBC for an "identical situation" -- this misrepresentation was fraudulent and unjust.

144.     Hiller and Lackluster Media benefitted financially from using Circled Wagons' creative product, and from Hiller's false and defamatory statements in Lackluster's Community tab -- which added to Lackluster's popularity and subscriptions at Circled Wagons' expense.

145.     It would be unjust for Hiller and Lackluster Media to retain any financial benefit from these actions.

146.     Circled Wagons was injured by Hiller and Lackluster Media LLC's retention of this financial benefit in an amount to be proven at trial.

WHEREFORE, Circled Wagons requests compensatory damages or restitution against Dale Hiller and Lackluster Media, LLC, and any other such relief as is permitted by law.

Respectfully Submitted,

*/s/ Jessica M. Hernandez*
Paul J. Kennedy
Jessica M. Hernandez
Esther C. Jamison
Kennedy, Hernandez & Associates, P.C.
201 Twelfth Street NW
Albuquerque, NM 87102
(505) 842-8662
pkennedy@kennedyhernandez.com

*Attorneys for Defendant/Counterclaimant Circled Wagons Management, LLC*

I hereby certify that a copy of the above was delivered via CM/ECF to all counsel of record in this matter on the date indicated on the notice of electronic filing.


*/s/ Jessica M. Hernandez*
Jessica M. Hernandez